**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-cr-84-APM** |
| **KYLER JOSEPH BARD,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Kyler Joseph Bard to 27 months of incarceration for his crimes, including for assaulting a police officer in violation of 18 U.S.C. § 111(a)(1). The government also recommends 36 months of supervised release, 100 hours of community service, $2,000 in restitution, and $285 in mandatory assessments. The government's recommended term of incarceration is the bottom of the applicable 27–33 month guidelines range calculated by the government, and the midpoint of the 24–30 guidelines range calculated by United States Probation Office. A 27-month sentence reflects the gravity of Bard's conduct, but also acknowledges his admission of guilt.

## I.    INTRODUCTION

The defendant, Kyler Joseph Bard, violently participated in the January 6, 2021, riot at the United States Capitol that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States

While the riot was underway, Bard, carrying a megaphone, stormed the police line at the Upper West Terrace. The vastly outnumbered officers were attempting to keep rioters away from the U.S. Capitol building. At around 3:30 p.m., Bard saw another rioter charge the police line and push officers. Bard yelled into his megaphone, "Move! Move! Move! We gotta push! We gotta push! Let's go! We gotta go! Let's go!" He turned directly toward the police line and yelled, "let's push!" He lowered his shoulder and rammed his body into an MPD police officer who was holding the line. Officers repelled Bard's assault, and he fell backwards. He continued to resist and push against the officer until he fell to the ground. As Bard fell backwards, he yelled to the officers, "You're all a bunch of pieces of shit." He picked himself up and retreated back into the crowd. In a telephone conversation shortly after the assault, Bard stated that the rioters had to get inside and "take over" the Capitol building. He later bragged on Instagram that he was proud to have participated in the riot.

The government recommends that the Court sentence Bard to 27 months of incarceration for his convictions.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021, Attack on the Capitol

The government refers the court to the Statement of Offense filed in this case, ECF 41, for a short summary of the January 6, 2021, attack on the United States Capitol by hundreds of rioters,

---

Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election.

    **B.    Bard's Role in the January 6, 2021, Attack on the Capitol**

On January 6, 2021, Bard was at the riot already underway outside the U.S. Capitol building. By approximately 3:28 p.m., Bard had moved inside the restricted area of the Capitol grounds. He was standing at the Upper West Terrace in front of a police line and above other rioters who were positioned below and behind him. Officer M.G. with the Metropolitan Police Department (MPD) was among the officers attempting to keep the rioters away from the U.S. Capitol building.



*Image One: Video Still from Exhibit 1 (00:44)*

At around 3:30 p.m., a rioter charged the police line. Seeing this, Bard yelled into his megaphone, "Move! Move! Move! We gotta push! We gotta push! Let's go! We gotta go! Let's go!" Gov. Ex. 1 (00:40). He turned directly toward the police line and yelled, "let's push!" He lowered his shoulder and rammed his body into an MPD police officer who was holding the line.

3



*Image Two: Video Still from Exhibit 1 (00:51)*



*Image Three: Video Still from Exhibit 1 (00:51)*



*Image Four: Video Still from Exhibit 1 (00:55)*



*Image Five: Video Still from Exhibit 1 (00:55)*

Officers repelled defendant's assault, and he fell backwards, continuing to resist and push against the officer until he fell to the ground. As defendant fell backwards, he yelled to the officers, "You're all a bunch of pieces of shit." He stood up and retreated back into the crowd. Gov. Ex. 1 (00:55).

Later, Bard was recorded on video as he talked on a cell phone, saying, "I've already been maced, punched, they took my microphone away, and, uh, when I punched them, they punched me back and maced me in the face." He also said, "But it's what we gotta do. We gotta get inside, we gotta take it over. We gotta do it." Gov. Ex. 2.

Sometime after the January 6th attack, images of Bard appeared on his Instagram account showing him on the grounds of the U.S. Capitol during the riot. Bard included a statement along with those photographs: "Over the last day I've been maced and punched for yelling in a megaphone, we were locked in our hotel by police and threatened by ANTIFA. It's been a wild ride and I'm so lucky to have experienced a once in a lifetime event." Gov. Ex. 3.

## III.    THE CHARGES AND PLEA AGREEMENT

On March 15, 2023, a federal grand jury returned an indictment charging Bard with six counts, charging violations of 18 U.S.C. §§ 111(a)(1), 231(a)(3), 1752(a)(1), 1752(a)(2), 1752(a)(4), and 40 U.S.C. § 5104(e)(2)(F). On May 28, 2024, Bard pleaded guilty to the indictment and not pursuant to any plea agreement.

## IV.    STATUTORY PENALTIES

Bard now faces sentencing on the six counts charged in the indictment. The PSR recites the statutory maximum penalties for each count of conviction. PSR ¶¶ 114–20, 122–25, 141–46.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The revised PSR includes one error.[2] For Group 2 (Counts 3 and 4), the revised PSR calculates the total offense level as 10, applying U.S.S.G. § 2A2.4 without any adjustments. PSR ¶¶ 52–57. For either Count 3 (a violation of 18 U.S.C. § 1752(a)(1)) or Count 4 (a violation of § 1752(a)(2)), however, the total offense level is 14. The government's guidelines analysis follows:

Count One: 18 U.S.C. § 111(a)(1) (Assaulting, Resisting, or Impeding)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[3] | Intent to Commit Another Felony | 14 |
| U.S.S.G. § 3A1.2(a)–(c) | Official Victim | +6 |
| | **Total** | **20** |

Count Two: 18 U.S.C. § 231(a)(3) (Civil Disorder)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Intent to Commit Another Felony | 14 |
| U.S.S.G. § 3A1.2(a)–(c) | Official Victim | +6 |
| | **Total** | **20** |

---

[2] The United States Probation Office calculated a total offense level of 17 in its draft PSR (ECF 43, ¶ 52), but it was unclear whether this was due to a typo. On October 31, 2024, the government alerted Probation and defense counsel about the typo. The final and corrected PSR (ECF 47) indicates that the government and Probation disagree on the total offense level (18 and 17, respectively). The government regrets that it did not timely object to the calculation in the draft PSR.

[3] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault. "Aggravated assault" includes any felonious assault that involved "an intent to commit another felony." § 2A2.2, Note 1(D).

Count Three: 18 U.S.C. § 1752(a)(1) (Entering and Remaining)

| U.S.S.G. § 2B2.3(c)(1)[4] | Intent to Commit Another Felony | <u>14</u> |
| | **Total** | **14** |

Count Four: 18 U.S.C. § 1752(a)(2) (Disorderly Conduct)

| U.S.S.G. § 2A2.2(a)[5] | Aggravated Assault | <u>14</u> |
| | **Total** | **14** |

Count Five: 18 U.S.C. § 1752(a)(4) (Act of Physical Violence, Restricted Grounds)

| U.S.S.G. § 2A2.2(a)[6] | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(a)–(c) | Official Victim | <u>+6</u> |
| | **Total** | **20** |

Count Six: 40 U.S.C. § 5104(e)(2)(F) (Act of Physical Violence, Capitol Grounds)

As a Class B misdemeanor, the Guidelines do not apply. U.S.S.G. § 1B1.9.

Group 1: Counts One, Two, and Five

Under U.S.S.G. § 3D1.2(a) these counts involve the same victim and the same act and transaction, that being the attack on Officer M.G. The offense level for Group 1 is 20. Group 1 comprises one unit.

Group 2: Counts Three and Four

The victim for those counts is the United States Congress. The offense level for Group 2 is 14. Group 2 is 6 levels less serious than Group 1, and receives one-half unit under U.S.S.G. § 3D1.4(b).

---

[4] By cross-reference from U.S.S.G. § 2B2.3(c)(1) (Trespass), which directs that § 2X1.1 (Attempt, Solicitation, or Conspiracy) be applied if the resulting offense level is greater than that determined by § 2B2.3(a)–(b) (a total offense level of 6).

[5] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

[6] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

8

Under U.S.S.G. § 3D1.4, 1 ½ units adds one level to the Group with the highest offense level; therefore, the Combined Offense Level is **21**.

| | |
|---|---|
| **Combined Offense Level** | **21** |
| Acceptance of responsibility (U.S.S.G. § 3E1.1) | <u>-3</u> |
| **Total Adjusted Offense Level:** | **18** |

Because the government is requesting a sentence that is within the guidelines range calculated by the U.S. Probation Office, and to avoid unnecessary litigation, the government requests that the Court both state on the record its calculation of the Sentencing Guideline range, and also state that it would have imposed the same sentence regardless of that range.

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria.

Section 4C1.1 does not apply in this case, because Bard used violence against Officer M.G. Violence has been defined by a court from this jurisdiction as "[t]he use of physical force," typically "accompanied by fury, vehemence, or outrage" and "unlawfully exercised with the intent to harm." *United States v. Bauer*, 21-cr-386-2 (TNM), ECF 195 at 4-5 ("Or, similarly, 'violence' is the 'exertion of any physical force so as to injure or abuse.'"); *see also United States v. Hernandez*, 21-cr-445 (CKK), ECF 65 at 5 (adopting the definition of violence in *Bauer*).

Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court were to find that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future

9

deterrence, despite a person's limited criminal history.

Finally, to avoid unnecessary litigation, if the Court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[7]

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 69. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 18, Bard's Guidelines imprisonment range is 27 to 33 months of imprisonment. The government agrees with Probation that the guidelines do not authorize a sentence of probation in this case.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a substantial term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Bard's felonious conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Bard charged a police line in the middle of this riot. He also directed other rioters to attack the police line by shouting encouragement through his megaphone.

---

[7] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under § 4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

The nature and circumstances of Bard's offenses were of the utmost seriousness, and fully support the government's recommended sentence.

### B.    The History and Characteristics of the Defendant

Bard is a 28-year-old man from Missouri. PSR ¶ 75. He married in February 2022 and has a one-year-old daughter. PSR ¶ 81. He does not have a history of substance abuse or mental- or emotional-health problems. PSR ¶ 90. He has a high school education. PSR ¶ 93. He currently works for his father and has worked in construction for around five years; he was a sales representative for five years before that. PSR ¶¶ 95–102.

Unlike some criminal defendants whose choices have been confined by circumstance, Bard was living a seemingly law-abiding and well-adjusted life. This highlights the willfulness of his assaultive conduct, especially when viewed in the light of his statements at and after the riot. He expressed a desire to enter the U.S. Capitol building and "take it over," notwithstanding the violence inflicted on police and their efforts to stop the rioters. Moreover, the way Bard minimized his conduct in social media—suggesting that police "maced and punched" him for shouting into a megaphone—shows his willingness to misrepresent the truth. Bard's actions during and after January 6, 2021, show serious lack of judgment, disrespect for the rule of law, and disregard for the physical safety of others.

**C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Bard's criminal conduct on January 6 was the epitome of disrespect for the law. As a court from this jurisdiction noted: "We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power." *United States v. Cronin*, 22-cr-233 (ABJ), Tr. 06/09/23 at 20.

**D.    The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[8] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

First, although Bard has a criminal history category of I, his behavior and statements show that he was among the rioters who were willing to engage in violence to disrupt the certification of the 2020 presidential election. *See* Section VI(B) *supra.* Second, although the Bard has now

---

[8] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

accepted responsibility for his actions, his social media statements after January 6 were those of a man falsely claiming that the police were engaged in repressive conduct—not someone who was filled with remorse. *See United States v. Matthew Mazzocco*, 21-cr-54 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found

guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[9] "When an offense is uniquely serious,

---

[9] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022, Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob

courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[10] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Landon Copeland*, 21-cr-570 (APM), the defendant assaulted police officers in the West Plaza outside the Capitol building. Copeland charged at police with a bike-rack barrier. Pursuant to a plea agreement, he pleaded guilty to assaulting USCP and MPD officers with a metal fence in violation of one count of 18 U.S.C. § 111(a)(1). This Court sentenced Copeland to 36 months of incarceration and 36 months of supervised release. Like Copeland, Bard charged a police line when officers were attempting to keep the rioters away from the Capitol building. Unlike Copeland, Bard did not use a barricade or similar item when he attacked police. And while Copeland's conduct was somewhat more violent, Bard's actions included an attempt to rally other rioters to attack the police.

In *United States v. Salvatore Vassallo*, 21-cr-325 (ABJ), the defendant refused to clear the Upper West Terrace around 4:26 p.m. when police were instructing rioters to move off Capitol

---

violence that took place on January 6th of 2021.") (statement of Judge Pan).

[10] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

grounds. Vassallo then charged an MPD officer who was fending off other rioters. Bard engaged in similar conduct, but his conduct also included attempts to rally other rioters by shouting into his megaphone that rioters should "push" the police line. Vassallo pleaded guilty early in the case to violating Section 111(a)(1), and admitted to assaulting an MPD officer. Judge Berman Jackson sentenced Vasallo to 18 months of incarceration and 36 months of supervised release for his violation of 18 U.S.C. § 111(a)(1).

In *United States v. Bobby Russell*, 23-cr-29 (APM), the defendant struggled over a bike-rack barrier with police. He also pressed his body against the shields of officers trying to clear the Upper West Terrace. Russell pleaded guilty to violating a single count of Section 111(a)(1). This Court sentenced Russell to 12 months and a day of incarceration, 6 months of home detention, and 24 months of supervised release. The Court gave significant weight to Russell's acts of service in his community, a factor that is absent in this case. Unlike Russell, Bard did not merely press his body against a shield or grab an officer as he was going down. Rather, Bard charged a police line and incited other rioters to do the same. Any belated expression of remorse by Bard should be viewed skeptically because his social-media comments show that he felt "lucky to have experienced a once in a lifetime event."

## VII.    RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with

discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property . . . including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). But Bard was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the

17

court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[11]

Because Bard engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[ ] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Bard to pay $2,000 in restitution for his

---

[11] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

convictions on Counts One through Six. This amount fairly reflects Bard's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.    FINE

Bard's convictions subject him to a statutory maximum fine of $250,000 for Count 1, $250,000 for Count 2, $100,000 for Count 3, $100,000 for Count 4, $100,000 for Count 5, and $5,000 for Count 6. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider Bard's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023).

Here, Bard's financial assets set forth in the PSR suggest that he is unable, and is unlikely to become able, to pay a significant fine.

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 27 months of incarceration, 36 months of supervised release, 100 hours of community service, $2,000 restitution, and $285 in mandatory assessments.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     /s/ Carlos A. Valdivia
        Kyle Mirabelli
        N.Y. Bar No. 5663166
        Carlos A. Valdivia
        D.C. Bar No. 1019242
        Assistant United States Attorneys
        601 D Street NW, Fifth Floor
        Washington, D.C. 20579
        E-mail: Carlos.Valdivia@usdoj.gov
        Telephone: (202) 252-7508

20